MARY L. HAYES, ADMINISTRATRIX, *vs.* THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

First Judicial District, Hartford, October Term, 1916.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

A recovery must be confined to the ground alleged in the complaint.

Upon appeal from a directed verdict, this court must assume the truth of the appellant's testimony, although contradicted, if the jury could reasonably have found the fact or facts which such evidence tended to prove.

An invitation by a railroad flagman to proceed over a dangerous grade-crossing, does not relieve the highway traveler of all responsibility for the outcome; he is still bound to act with common prudence in view of all the circumstances.

The evidence in the present case reviewed and *held* to lead necessarily to the conclusion that the plaintiff's intestate was guilty of contributory negligence in the operation of his automobile in approaching the crossing, and therefore that no error was committed in directing a verdict for the defendant. (*Two judges dissenting.*)

Argued October 3d, 1916—decided January 25th, 1917.

ACTION to recover damages for personal injuries resulting in the death of the plaintiff's intestate and alleged to have been caused by the defendant's negligence, brought to the Superior Court in Hartford County and tried to the jury before *Greene, J.;* by direction of the court the jury returned a verdict for the defendant, and from the judgment thereon the plaintiff appealed. *No error.*

The plaintiff's intestate, Edward L. Hayes, while driving his automobile southerly on the main road between Hartford and New Haven, received injuries which caused his death by being struck by a train coming from the east as he was attempting to pass over a grade-crossing in the town of Berlin. The crossing was a dangerous one, and especially so for travelers approaching it from the north, by reason of

the view of the railroad tracks to the east being shut off for a considerable distance by buildings of the American Brick Company. These buildings consist chiefly of a long narrow brick kiln shed, forty feet in height, running parallel to the railroad tracks and not far distant therefrom, having its westerly end two hundred feet from the highway, and a two-story office building, eighteen feet wide in front, standing about twenty-five feet from the highway and back from the crossing one hundred and thirty-nine feet. As a result of the presence of these buildings, a southbound traveler's view of the tracks east of the crossing is obstructed for a considerable distance until he arrives opposite the office, where, at a distance of one hundred and sixty-four feet from the middle of the tracks, there is an open view of them for two hundred and sixty-five feet. From that point, continuing southerly, the unobstructed view gradually increases until at sixty-five feet from the crossing it extends up the tracks four hundred and seventy feet, at fifty feet, to five hundred and thirty feet or more, and at forty feet to twelve hundred feet. Across the highway north of the main line there is a siding for the use of the brick company, extending upon the company's premises up to and into the brick kiln building. Between the southerly rail of this siding and the northerly rail of the main line, the distance at the crossing is twenty-seven feet.

Evidence was offered on behalf of the plaintiff, that at the time of the accident there were two box-freight-cars standing on this siding on the brick company's premises, one end of the two cars being close to the shed and the other about fifty feet east of the highway. The presence of these cars would considerably lessen the distance on the highway from the main tracks that unobstructed views of them could be had for a given distance. Under such conditions the range of vision

easterly along the tracks at a point in the middle of the highway in front of the office would be slight. At one hundred and thirty-five feet northerly of the north rail of the main line it would be reduced, by the presence of the freight cars, to seventy feet; at one hundred feet, to ninety feet; at eighty feet, to one hundred and ten feet; at seventy feet, to one hundred and thirty feet; and at fifty feet, to two hundred and sixty feet. At a distance of thirty-five feet, twelve hundred and eighty feet of the tracks were in full view.

The highway at this point, at the time of the accident, was an improved road, in good condition, with a slightly descending grade toward the south.

The testimony on behalf of the plaintiff, relating to the circumstances immediately attending the accident, was confined to that of two witnesses, one of them a man named Gilman who was riding with and beside Hayes at the time. Their testimony, denied in important respects by the defendant's testimony, was to the following effect:—

Hayes was unfamiliar with the crossing. He saw it as he approached going something like twenty-five miles an hour, when he was about at a crossroad some six hundred feet away. He thereupon threw out the clutch, put on the brakes and gradually slackened his speed until he almost stopped, and was going not over ten miles an hour when he reached a point about opposite the office. At that time a man, standing at the crossing without a flag, but in fact the flagman in the defendant's employ, beckoned to him to cross, as the man had just previously done to a van which had crossed. Hayes then released the brakes, threw in the clutch and at a constantly increasing speed proceeded on his way. When his front wheels were about at the siding crossing, Gilman, who was sitting at Hayes' right, heard the train and glancing to the east back of Hayes saw it

coming and immediately jumped to the ground, landing not far from the north rail. Hayes went on, his speed at the time being about twenty miles an hour, and was struck by the train when partly over the crossing. There was no testimony that he looked, listened or took other precautions for his safety.

At the conclusion of the oral testimony, the court and jury, upon the agreement of counsel, visited and viewed the scene of the accident.

*Herbert O. Bowers,* for the appellant (plaintiff).

*William L. Barnett,* for the appellee (defendant).

PRENTICE, C. J. The complaint charges the defendant with negligent conduct causing personal injuries to the plaintiff's intestate and nothing more, and avers the absence of contributory negligence on the part of the latter. The action is, therefore, one founded upon negligence, and recovery upon any other ground was not permissible. *Pitkin* v. *New York & N. E. R. Co.,* 64 Conn. 482, 490, 30 Atl. 772; *Sharkey* v. *Skilton,* 83 Conn. 503, 507, 77 Atl. 950. Plaintiff's counsel do not claim otherwise.

The only evidence tending to show negligence on the part of the defendant was that given on the plaintiff's behalf, to the effect that the flagman stationed at the crossing, its employee, beckoned to Hayes as he approached the crossing to proceed. Although this testimony was denied by the defendant's witnesses, the plaintiff was entitled to go to the jury upon the issue of the defendant's negligence, and for our purpose we are required to assume that the invitation to cross was given as testified.

The invitation thus given was one which Hayes had a right to rely upon to some extent, but not to such an

extent that he was thereby excused from making some use of his senses and taking some precautions for his safety. "A railroad crossing is . . . a dangerous place, and the man who knowing it to be a railroad crossing approaches it, is careless unless he approaches it as if it were dangerous." *Borglum* v. *New York, N. H. & H. R. Co.*, 90 Conn. 52, 55, 96 Atl. 174. One who is invited to cross by the conduct of the railroad company, or of its employees or agents, or even directly by such employee or agent, is not justified in acting as though it were not dangerous, and will not be permitted to throw off from himself all responsibility for the outcome. He is still bound to act with common prudence in view of the dangers of the place as well as of the invitation. *Cottle* v. *New York, N. H. & H. R. Co.*, 82 Conn. 142, 144, 72 Atl. 727; *Dundon* v. *New York, N. H. & H. R. Co.*, 67 Conn. 266, 272, 34 Atl. 1041; *Ellis* v. *Boston & Maine Railroad*, 169 Mass. 600, 602, 48 N. E. 839; *Union Pacific R. Co.* v. *Rosewater*, 84 C. C. A. 616, 619, 622, 157 Fed. Rep. 168, 171, 174.

The question before the jury, on this aspect of the case, thus became resolved into one as to whether Hayes did exercise the common prudence of one who, cognizant of the dangerous conditions surrounding the crossing, had received an invitation from the flagman to cross. In this connection it is not without significance to observe that Hayes did not know that the man who beckoned to him was a flagman or employee of the company. He carried no flag, it is said, or other indication of his position or employment. All that Hayes knew was that the man was standing beside the crossing and was beckoning to him as he had to another car preceding his. This is not important as bearing upon the defendant's responsibility for the acts of the flagman, but it does possess significance in judging of the measure of prudence characterizing Hayes' conduct in relying

upon the signal of one who was a stranger to him and in throwing precaution to the winds.

But that feature of the case may be dismissed, and full effect given to the signal of the flagman as a known servant of the company. The evidence, upon which the plaintiff relies and must rely for recovery, discloses that Hayes received the invitation when, with clutch out and brakes on, he was proceeding slowly, and with his car under full control, along the highway some one hundred and fifty feet from the crossing where his view of the tracks to the east was practically cut off, and that he thereupon, without further inquiry or means of information, released the brakes, threw in the clutch, applied the power and proceeded with ever increasing speed down the grade toward the crossing. His increase of speed was such that it went up from ten miles or less an hour to about twenty in the short intervening space traveled. There is no evidence tending to show that he looked or listened for the approaching train. The plain indications are that he did not look, else he would have seen it a sufficient distance from the crossing to have enabled him to stop in safety, unless, indeed, his speed was too great. When he had proceeded but half way to the crossing and was seventy feet from it he could have seen up the tracks one hundred and thirty feet, and the train must have been within that distance at the time. If not, there can be no question that it was in full view when Hayes reached the fifty foot point, where two hundred and sixty feet of the tracks could be plainly seen. Gilman saw the train before the siding was reached, and took measures of escape. Hayes may also have seen, but by reason of his speed either did not dare to attempt to stop or thought that he could succeed in crossing. As to this we may not know what the fact was: but one thing is certain, and that is that a reasonably careful approach at a moderate speed and with

the car under proper control was all that was necessary for Hayes' safety. The situation is explainable only upon one of four assumptions: (1) that he did not look; (2) that he was going so fast and had so little control of his car that he could not stop after, by looking, he was able to see the tracks; (3) that he both failed to look, and was going at too great a speed; or (4) that he was going at such speed when the train was seen that he chose to venture to cross rather than to stop when he might.

His outstanding fault, assuming that he was not foolhardy in attempting to beat the train in passing the crossing, which the plaintiff's evidence establishes and for which no shadow of excuse is shown, lay in his operation of his car. When about one hundred and fifty feet from the crossing he was going slowly and had his car under control, instead of continuing at that or approximately that low speed and with that control for the short distance to the crossing, he rushed ahead upon receipt of the signal. The conditions which made the crossing especially dangerous were apparent and must have been appreciated by him, and yet he put himself, by his increase of speed, into a position where he could not help himself if suddenly danger arose. Had he proceeded at a lower speed and with his car under better control, he could readily have stopped it after he had an opportunity to discover the threatening presence of the train. Knowing, as even a casual observer must, the obstructions to his view, he, although an invitee, was bound in the exercise of ordinary prudence to use more care than the evidence, upon any view of it, shows that he exercised.

We are of the opinion that the trial court did not err in holding that the jury could not reasonably have found otherwise upon the evidence, and in directing a verdict for the defendant.

There is no error.

In this opinion THAYER and BEACH, Js., concurred.

WHEELER, J. (dissenting). The view of the evidence most favorable to the plaintiff which the jury could have reasonably found, must be adopted by the court in passing upon the question of directing a verdict, or on that of a directed verdict. Whether the two box cars were on the siding was a disputed fact. The jury might have found that they were there at the time of the accident. With these box cars on the siding the majority opinion finds the evidence to be that Hayes could have seen little of the main railroad track to the east of the highway while he was traveling south on the highway and opposite the office building at a point one hundred and thirty-nine feet from the crossing, and that when he was northerly of the north rail of the track he could have seen the track east of the highway crossing as follows: at one hundred and thirty-feet, seventy feet; at one hundred feet, ninety feet; at eighty feet, one hundred and ten feet; at seventy feet, one hundred and thirty feet; at fifty feet, two hundred and sixty feet; at thirty-five feet, one thousand two hundred and eighty feet.

It appeared in the evidence that Hayes could not have seen an approaching train between a point six hundred feet from the crossing and a point about one hundred and thirty-five feet from the crossing, except that at about four hundred or three hundred and fifty feet from the crossing the top of the cars could have been seen, and also a view of an approaching train could have been had between the shed and the box cars.

The nearer Hayes approached the crossing from a point fifty feet from it, the greater the distance he could have seen an approaching train, and at a point five feet from the north rail he could have seen a west-bound train two thousand four hundred and sixty-five

feet east of the crossing. There was a whistling post one thousand three hundred and forty-five feet from the crossing, and the engine gave the customary whistling signal at this point. There was also an automatic bell at the crossing which began to ring when this train was two thousand feet from the crossing and continued until the engine had passed the crossing.

A flagman was stationed at this crossing to protect travelers. Hearing this train approaching he left his shanty, which was on the east side of the highway and thirteen and one-half feet feet north of the north rail of the main track, and stood on the east side of the highway and a few feet north of the shanty. The flagman heard the bell ring when the engine passed the two thousand feet point. Hayes, when at the cross-road about six hundred feet from the crossing, thought he heard a train and stopped his automobile. He then went on at not to exceed twenty-five miles an hour until he came in the vicinity of the brick company buildings, when he slowed down to less than ten miles an hour. Gilman, who was a guest of Hayes and sat by his side, kept a lookout for an approaching train until after the flagman had beckoned Hayes to pass over the crossing. Gilman testified that at this time there was a large auto truck which had stopped at a switch crossing, and upon the flagman beckoning the truck to proceed it had crossed the main track in safety, and that Hayes proceeded on slowly after the truck, and as it passed over, the flagman beckoned Hayes to cross over, and he then released his brakes and increased his speed to about twenty miles an hour, and as the automobile was about crossing the switch the witness saw the train approaching and threw himself from the automobile and fell near the main track while Hayes drove on and his automobile was hit by the engine.

Harlow, a witness for the plaintiff, testified that

Hayes slowed down nearly to a standstill just behind the truck, which had stopped on the switch, and when the flagman had beckoned to the truck to cross and it had crossed over, he beckoned to Hayes to cross, which he did.

The plaintiff was entitled to ask the jury to find upon the testimony of either witness. Both witnesses agree that the truck crossed over just before Hayes attempted to, and both agree that the flagman beckoned to the truck to cross and to Hayes to cross. The difference in the testimony of these two witnesses is in the closeness of Hayes to the truck when it crossed over, and perhaps in the speed at which Hayes was traveling just prior to his receiving the flagman's signal to cross over. The train was approaching at a speed of thirty miles an hour. The flagman stood where he could see the approaching train for over one thousand two hundred feet, and he knew it was approaching when it was distant over two thousand feet. When he beckoned Hayes to cross over, the train was not over three hundred to four hundred feet from the crossing. It was the duty of the flagman to know where the train was, and not to beckon to Hayes to cross over unless he could do so with safety. He knew, or ought to have known by the use of ordinary diligence, that if Hayes crossed over upon his invitation he would be run down by the train. After Hayes passed the office building and slowed down to nearly a stop and received the signal from the flagman to cross over, there is no evidence that he or Gilman looked or listened, or took any precautions except to rely upon the fact that the truck had passed in safety upon the flagman's signal, and that the flagman had signalled them to cross over.

Hayes died as a result of his injuries; his declarations as to the flagman having signalled him to cross over were in evidence, but beyond this his statement did not go.

A mooted issue of fact was whether the flagman beckoned to Hayes to cross over. The jury might reasonably have found that he did. Assuming this to have been found, the defendant does not contest the issue of its negligence. The case turns upon whether Hayes' own negligence contributed materially to his injuries. As the majority read the evidence Hayes was one hundred and fifty feet from the crossing when the flagman signalled him to cross over. This we think conflicts with Gilman's and Harlow's testimony. The jury might have found Hayes was following close behind the truck and going slowly, and that when the truck got the signal to cross over it was near or upon the siding track, and when Hayes received the signal to cross he was at a point about seventy-five feet from the crossing. From that point he increased his speed from a very slow speed to twenty miles an hour when his car was struck. From the crossroad to the office building Gilman testified he was keeping a lookout, and he testified that as they approached the crossing he was watching for "any signs of danger." Whether Hayes was seventy-five or one hundred and fifty feet from the crossing when he received the signal, he could not have gotten his speed on the instant to twenty miles an hour, and it is reasonable to conclude that he could not have covered this distance at an average speed to exceed ten or fifteen miles an hour. As the train was going thirty miles an hour its speed was two or three times that of Hayes, and as at a point seventy feet from the crossing Hayes could have seen the train only when it was one hundred and thirty feet from the crossing, it was impossible for him to have seen the train had he looked at the seventy-foot point. The opinion of the court holds otherwise, and we think mistakenly.

If Hayes traveled from this point to the crossing at

twenty miles an hour, the train would have gone one hundred and five feet while he was going seventy. When issues of fact are as close as this, it seems preferable to permit the trier to determine the facts.

We think it clear from the evidence, that the first point at which Hayes could have seen the approaching train was when he was fifty feet from the crossing; from that point he could have seen the train when it was two hundred and sixty feet from the middle of this crossing. And we think, too, the jury might reasonably have found that Hayes, had he seen the train at this **point**, might have stopped before the engine struck his automobile.

The question is, does this situation, which the evidence discloses, require the conclusion, as matter of law, that Hayes, in failing to look and stop his automobile, and in relying upon his not having seen the train up to the time the truck was invited by the flagman to cross over, and upon the fact that the truck passed over in safety upon the invitation of the flagman, and upon the express invitation of the flagman to him to cross over, did not act as a reasonably prudent man would have acted. It was competent for the jury to have found that the truck made considerable noise in crossing over the switch and main tracks, and that the noise of the truck and of his own machine may have prevented Hayes hearing the approaching train and the bell. Hayes could not rely wholly upon the flagman's invitation and fail altogether to use his own senses; and he did not. Up to a point within about fifty feet of the crossing, the jury may have found that he or Gilman had been keeping a lookout for a train from the east. He saw the flagman beckon the truck to cross over and he saw the truck cross in safety. Then the flagman beckoned him to cross over and he followed close behind the truck. Hayes was under no

obligation, at the peril of being deemed negligent, to make the utmost use of his senses which it was practicable to make. The reasonable use which common prudence requires is one dependent upon the attendant circumstances. The man of ordinary prudence might, we think, have acted in just the way Hayes did. In any event, it cannot be said as matter of law that no reasonably prudent man could have crossed over under these circumstances without looking or stopping. Whether Hayes was negligent was, in our judgment, a question of fact for the jury.

The Connecticut cases cited by the majority are not decisive of this case. *Dundon* v. *New York, N. H. & H. R. Co.*, 67 Conn. 266, 34 Atl. 1041, at page 270, expressly holds that the question of contributory negligence,—where the plaintiff had passed over a highway crossing without looking and in reliance upon the fact that as the flagman was not present and he customarily was present when a train was approaching,—was a question of fact for the trier, and for the application of the rule laid down in the leading case of *Farrell* v. *Waterbury Horse R. R. Co.*, 60 Conn. 239, 257, 21 Atl. 675, 22 id. 544. This is the very doctrine we invoke, that the situation surrounding Hayes' conduct presents a question of fact for the jury. In *Cottle* v. *New York, N. H. & H. R. Co.*, 82 Conn. 142, 144, 72 Atl. 727, no bell was sounded or whistle blown as was customary, and the intestate drove on to a dangerous crossing without using his senses to discover whether the track was clear. That is not this case. Here the railroad's authorized agent told Hayes to pass on, and he had just seen a truck pass in safety on a similar invitation; and either he or Gilman had been keeping a proper lookout until the flagman beckoned. We know of no case similar to this in jurisdictions which hold with us that the stop, look and listen rule is one of fact and not of

law, where the contributory negligence of a plaintiff has been decided to be a question of law. Hayes was allured into the danger by the agent of the defendant, and whether Hayes was negligent in relying upon this agent depends upon a number of facts and the inferences to be drawn from them. Upon principle and authority the issue of Hayes' negligence was one of fact.

But the case presented in the complaint is not one of mere negligence, but one of wanton misconduct. The allegations are: "While in the act of such endeavor" (that is, to ascertain whether the train was approaching), "the said flagman who was the servant of the defendant, made gestures to said Edward L. Hayes, which gestures appeared to said Hayes as, and in fact were, an invitation to proceed to pass over said crossing: and said gestures were negligently and carelessly made by said flagman when he well knew that a train of the defendant was rapidly approaching said crossing and was but a short distance away." Allegations that a defendant acted negligently or wantonly are not ordinarily necessary, although not improper allegations. The facts which make out the negligence or the wanton misconduct must be alleged, and the case will be tested by the facts alleged and not by the pleader's characterization of the facts. In this case, the allegation that the gestures of the flagman were negligently and carelessly made do not convert the action into one exclusively of negligence. They help make out the wanton misconduct by characterizing the acts of the flagman. *O'Keefe* v. *National Folding Box & Paper Co.*, 66 Conn. 38, 44, 33 Atl. 587. The evidence would have justified the jury in finding these allegations proven, and in finding that this flagman's invitation to Hayes, if accepted, would have placed Hayes in a highly dangerous position, when to all appearances Hayes did not know of the danger. The flagman ought to have known of this. If the jury

so found, it was wanton misconduct on his part and indicated a reckless disregard of consequences. Such conduct was a gross abuse of the flagman's duty toward Hayes. Contributory negligence is no defense against wilful or wanton misconduct. Wanton misconduct is more than negligence, more than gross negligence. It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of action. Wilful misconduct is intentional misconduct, and wanton misconduct is reckless misconduct which is the equivalent of wilful misconduct. If the flagman beckoned Hayes to cross, he summoned him to his death, and when he did it he knew that the train was rapidly approaching the crossing and was but a short distance away, and he knew, or ought to have known, that he was subjecting Hayes to the danger of being run into by the train. These facts, if found by the jury, present an aggravated case of wanton misconduct.

We have frequently held or stated that "the defense of contributory negligence would not be available" in cases where injury is inflicted under conditions open to the charge of wilfulness or wantonness. *Nehring* v. *Connecticut Co.*, 86 Conn. 109, 122, 84 Atl. 301; *Rowen* v. *New York, N. H. & H. R. Co.*, 59 Conn. 364, 21 Atl. 1073; *Pitkin* v. *New York & New Eng. R. Co.*, 64 Conn. 482, 490, 30 Atl. 772; *Beers* v. *Boston & Albany R. Co.*, 67 Conn. 417, 426, 427, 34 Atl. 541; *Banks* v. *Braman*, 188 Mass. 367, 74 N. E. 594; Beach on Contributory Negligence, § 64; 1 Thompson on Negligence, § 383; 29 Cyc. 578.

In my judgment the direction of the verdict was erroneous.

In this opinion RORABACK, J., concurred.